[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
MOTION FOR MISTRIAL
On June 9, 1995, the defendant filed a motion for mistrial stating that "after the conclusion of the trial in this matter, the defendant learned that during the trial there had been an ex parte communication between the plaintiff and the Judge hearing this matter." After hearing, the court denied the motion on June 13, 1995.
Due to space limitation in the Litchfield Courthouse, this case was heard in the Court's Chambers. On June 1, 1995 at approximately 1:55 p.m. the plaintiff returned from lunch and entered the chambers and resumed his place near the table reserved for counsel. Present in the room was the undersigned, the court reporter and Debra Van Keuren, defendant counsel's paralegal. The conversation set forth in Appendix A and B was initiated by the plaintiff and his questions were merely responded to by the court. Nothing regarding the case was discussed, the chamber's door was open and a representative of the defendant was present.
The rule as set forth in Dubaldo v. Dubaldo, 14 Conn. App. 645, at 649 is as follows:
 The code sets forth an objective standard for disqualifications; Canon 3(C)(1) provides:" "A judge should disqualify [herself] in a proceeding in which [her] impartiality might reasonably be questioned. . . ." (Emphasis added.) "'Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's "impartiality might reasonably be questioned" is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety. . .that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard. CT Page 6236 . . .' Thode, Reporter's Notes to Code of Judicial Conduct (1973), pp. 60-61. `The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all the circumstances.' Rice v. McKenzie, 581 F.2d 1114, 1116 (4th Cir. 1978); see Spires v. Hearst Corporation, 420 F. Sup. 304, 307
(D.Cal. 1976)." Papa v. New Haven Federation of Teachers, supra, 745-46.
It is submitted that an examination of the testimony set forth in the Appendix clearly demonstrates that "another, not knowing whether or not the judge is actually impartial, mightreasonably question his [or her] impartiality on the basis of all the circumstances." It is obvious from a comparison of the testimony of the two witnesses that Debra Van Keuren was present during the entire conversation and that nothing concerning the case was discussed.
 II
The plaintiff, Robert E. Kane, age 48, and the Defendant, Elizabeth G. Kane, age 48, whose maiden name was Elizabeth Getsinger, were married at Watertown, Connecticut on June 26, 1971. The parties have two adult children, Daniel and Patience.
From the evidence, it is apparent that the marriage has broken down irretrievably. The plaintiff and the defendant separated in July 1993. The marital home was sold in 1994 and there is presently approximately $11,200.00 held in escrow from the sale of that property. The plaintiff presently lives in Warren, Connecticut with a woman he began seeing in August 1993 after his wife had left the marital home. Mrs. Kane resides at Titus Road, Washington, Connecticut where she also operates her own framing business.
The defendant claims that the cause of the breakdown was excessive drinking on the part of the plaintiff and mismanagement of money and extravagance on the part of her husband. The plaintiff admits to a drinking problem in the years 1973-76 but claims that he stopped for a period of three years. Mr. Kane claims that his drinking is limited to beer only and denies being an alcoholic. Mrs. Kane claims that excessive use of alcohol was a problem in the marriage and caused a change in personality in CT Page 6237 her husband. Her testimony is corroborated by the daughter who was obviously a witness partial to her mother.
While the plaintiff has a good job as a full time optometrist, his management of money has left much to be desired. He made an unwise investment in Torrington real estate which resulted in a loss of approximately $40,000.00 and the decision not to keep current the mortgage on the family home in Washington, Connecticut on Shinar Mountain Road was also unwise. All financial decisions were made by Dr. Kane and were a cause of great concern to Mrs. Kane. The court finds that the use of alcohol, although not health threatening, coupled with money mismanagement were the major causes of the breakdown. Another factor in the breakdown was the severe depression suffered by the defendant requiring psychiatric care and medication.
Since 1988, the defendant has been treating with a psychiatrist on a fairly regular basis. She requires medication and will require its aid for the rest of her life. Mrs. Kane suffers from fatigue and dizziness but is able to function in her work as she is self employed. The defendant has completed three plus years of college but has not acquired any particular employment skills.
At the present time, the defendant has a framing business in her home which shows no profit. However an unsigned schedule C for her 1994 income tax shows a profit of $307.00. It is noted, however, that one half of her rent, utilities and telephone are charged to her business. She receives $46.51 per week or $1,461 per year from property located in Maine. In 1998 there will be a balloon payment of $34,000.00 of which she is entitled to $17,000. On her affidavit, she claims weekly expenses of $401.80 including $37.63 for medical and $25.00 for her daughter's therapy. The defendant shows liabilities of $37,971.22 including: Sharon Ward, $541.00; Dr. Sicher $2,450.00; Chase Visa, $110.00; Mastercard $656.00; Car loan for daughter, $4,000.00; Legal fees, $15,000.00; Accountant fees, $300.00; SNETCO, $505.22; IRS, $11,000.00; IRS, $3,500.00.
Dr. Kane is employed by The Optical Boutique Limited Partnership as a full time optometrist. His salary is $139,984 per year through December 31, 1995. In the event he terminates this employment there will be a $125,000.00 payment over a five year period. According to his affidavit, the plaintiff claims a net weekly income of $2,045.00 and expenses of $1,672.00. The CT Page 6238 plaintiff shows liabilities of $74,035.00 including: MBNA Mastercard, $11,846; Chevy Chase VISA, $20,351; Chase VISA, 3,460; MBNA VISA, $3,411; Citibank VISA, $3,045; personal loan (parents), $4,000; Cramer Anderson, $1,318; Internal Revenue ('93 tax), $8,006; Internal Revenue ('94 tax), $24,423; Baker, Moots Pellegrini, $3,727; Texaco, $450.00.
In determining whether to award alimony, the court "shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and. . .[any property] award. . .pursuant to section46b-81. . . ." General Statutes, Sec. 46b-82. In assigning property when dissolving a marriage, the court, in addition to the criteria listed in section 46b-82 must consider the liabilities of the parties and "the opportunity of each for future acquisition of capital assets and income." General Statutes, Sec.46b-81 (c).
"The court is not obligated to make express findings on each of these statutory criteria. Dubicki v. Dubicki, 186 Conn. 709. 716, 443 A.2d 1268 (1982); Posada v. Posada, 179 Conn. 568, 573,427 A.2d 406 (1980). The purpose of alimony is to meet one's continuing duty to support; Wood v. Wood, 165 Conn. 777, 784,345 A.2d 5 (1974); while the purpose of property division is to unscramble the ownership of property, giving each spouse what is equitably his. Beede v. Beede, 186 Conn. 191, 195, 440 A.2d 283
(1982)." Weiman v. Weiman, 188 Conn. 232, 234; Sweet v. Sweet,190 Conn. 657, 660.
From the evidence and applying the relative legal principles involved, the court finds that the following orders should enter:
1. The marriage of the parties is dissolved on the grounds of irretrievable breakdown.
2. Alimony. The plaintiff shall pay to the defendant the sum of Twenty Eight Hundred Dollars ($2,800.00) per month commencing July 1995, payable $1,400.00 on or before the 5th day of the month and $1,400.00 on or before the 20th day of the month. Said alimony shall terminate upon the death of either party, the defendant's remarriage or her cohabitation, whichever shall first occur. CT Page 6239
This alimony award is based on the plaintiff's current income with Opti-Care. His option with Opti-Care terminates at the end of 1995 and if the option is not renewed and his income decreases, the amount of alimony may be reviewed by the court at that time.
3. Medical Insurance. The plaintiff shall cooperate fully with the conversion of the medical insurance for the defendant through COBRA. The defendant shall be responsible for the payment of the premium for said coverage at a cost of approximately $160.00 per month.
4. Life Insurance. The plaintiff shall maintain his life insurance policy in the amount of $50,000 as available through Opti-Care naming the defendant as irrevocable beneficiary of same for as long as he has an obligation to pay alimony to the plaintiff.
5. Deferred Assets, Stock Options, etc. The plaintiff shall assign to the defendant a one-half interest in his stock options or other interest in Opti-Care, up to a maximum of $62,500.00 (one-half of the total amount he is entitled to receive at the present time). The stock options, in the amount of $125,000, are payable over a five (5) year period and are payable only if the plaintiff fulfills the remainder of his contract with Opti-Care and does not renew said contract. The defendant shall receive said amount at the time the plaintiff receives same.
6. Mortgage (Maine Property). The mortgage held by the parties, as a result of the sale of their property in Maine, shall become the sole property of the defendant.
7. Real Property (Lot on Revere Road). The property on Revere Road in Washington, Connecticut shall remain in joint names. All costs of maintaining the property shall be paid by the plaintiff and they must use their best efforts to arrive at a reasonable price at which to market the property. The net proceeds of such sale shall be shared equally by the parties.
8. Escrowed Funds (Sale of Shinar Mountain Property). There is approximately the sum of Eleven Thousand Two Hundred ($11,200.00) Dollars being held in escrow from the sale of the parties' property on Shinar Mountain Road in Washington, Connecticut. Said sum shall be divided equally between the parties. The parties shall each be responsible for their share of CT Page 6240 the capital gains related to said property.
9. Debts. Each party shall be ordered to make payment of those debts as reflected on their financial affidavits and to hold the other party harmless therefrom with the exception of the following which the plaintiff is ordered to pay immediately:
 a. The defendant's bill to Sharon Ward, Chiropractor, which the plaintiff was ordered to pay previously in the amount of $541.00;
 b. One-half of all unreimbursed medical expenses of the defendant since the date of the last court order in the amount of $294.23.
Judgment may enter accordingly.
PICKETT, J.
APPENDIX A AND B
No. FA-93-0063450 : SUPERIOR COURT ROBERT E. KANE : JUDICIAL DISTRICT vs. : OF LITCHFIELD ELIZABETH G. KANE : JUNE 13, 1995
BEFORE:
THE HONORABLE WALTER M. PICKETT, JR., JUDGE
APPEARANCES:
 ROLAND MOOTS, ESQ. ATTORNEY FOR THE PLAINTIFF
 KATHERINE WEBSTER-O'KEEFE, ESQ. ATTORNEY FOR THE DEFENDANT
REPORTED BY:
 KIMBERLY R. BECK CERTIFIED SHORTHAND REPORTER SUPERIOR COURT 15 WEST STREET P.O. BOX 131 LITCHFIELD, CT 06759 CT Page 6241 567-4263
 (AFTER COLLOQUY DISCUSSION, THE FOLLOWING TOOK PLACE.)
DEBRA VANKEUREN,
 CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING BEEN DULY SWORN BY THE CLERK TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, TESTIFIED ON HER OATH AS FOLLOWS:
 THE CLERK: STATE YOUR NAME, SPELL YOUR LAST NAME, AND GIVE YOUR ADDRESS FOR THE RECORD.
 THE WITNESS: DEBRA, D-E-B-R-A, VAN KEUREN, V-A-N-K-E-U-R-E-N, 44 FLIRTATION AVENUE, NEW PRESTON, CONNECTICUT.
THE CLERK: THANK YOU. YOU MAY BE SEATED.
 (WHEREUPON, COLLOQUY DISCUSSION OCCURRED, AND THE FOLLOWING TOOK PLACE.)
 DIRECT EXAMINATION BY MS. WEBSTER-O'KEEFE:
Q MS. VAN KEUREN, DO YOU RECALL BEING IN COURT ON THURSDAY, JUNE 1ST, '95 IN THE MATTER OF KANE VERSUS KANE, THAT WE'RE HERE ON TODAY?
A YES.
Q AND DO YOU RECALL WHAT TIME WE BROKE FOR LUNCH RECESS?
A FIVE OF ONE.
Q WHERE DID WE GO RIGHT AT THE BEGINNING OF THE LUNCH RECESS; DO YOU RECALL?
A WE WENT DOWNSTAIRS IN FRONT OF THE COURTHOUSE.
Q AND WHO WAS PRESENT?
A MYSELF, ATTORNEY O'KEEFE, MRS. KANE, AND HER SISTER ANN, CT Page 6242
AND HER DAUGHTER PATIENCE.
Q AT THAT TIME WHAT DID YOU OBSERVE ABOUT MRS. KANE'S BEHAVIOR?
(WHEREUPON, THERE WAS AN OBJECTION BY MR. MOOTS,
COLLOQUY OCCURRED, AND THE FOLLOWING TOOK PLACE.) BY MS. WEBSTER-O'KEEFE:
Q MRS. VAN KEUREN, WHAT TIME DID YOU RETURN TO THE COURTHOUSE?
A AROUND TEN OF TWO.
Q AND WHERE DID YOU GO?
A TO THE HALLWAY UPSTAIRS.
Q AND WHAT DID YOU SEE THERE?
A MRS. KANE, HER SISTER, AND HER DAUGHTER PATIENCE, DR. KANE, AND ATTORNEY MOOTS, DONNA DEBONUS (PHONETIC), AND I DON'T — MR. MOOTS' PARALEGAL.
Q HOW LONG WERE YOU IN THE HALLWAY; DO YOU RECALL?
A I DON'T RECALL.
Q AND DID YOU LEAVE THE HALLWAY AT ALL BEFORE THE TRIAL BEGAN AFTER THE LUNCH RECESS?
A NO, I DID NOT.
Q DO YOU RECALL ABOUT WHAT TIME YOU RETURNED TO THAT UPPER STAIRWELL BEFORE — AFTER LUNCH? I AM SORRY, AFTER LUNCH?
A AT AROUND TEN OF TWO.
Q NOW, DID YOU OBSERVE DR. KANE LEAVE THE HALLWAY AT ALL?
A YES. CT Page 6243
Q AND WHERE DID HE GO?
A HE WENT DOWNSTAIRS WITH HIS ATTORNEY.
Q ALL RIGHT. DO YOU KNOW HOW LONG HE WAS GONE?
A AROUND TEN MINUTES.
Q AFTER HE RETURNED — AND THEN DID HE RETURN TO THE HALLWAY?
A YES.
Q AND AFTER HE RETURNED TO THE HALLWAY, DID YOU SEE HIM STAY THERE FOR SOME TIME?
A YES.
Q DO YOU RECALL HOW LONG HE WAS THERE AFTER HE RETURNED TO THE HALLWAY?
A NO.
Q OKAY. DID YOU SEE HIM LEAVE AGAIN?
A I DON'T RECALL.
Q NOW, DID THERE COME A TIME WHEN YOU LEFT THE HALLWAY?
A NO.
Q DID THERE COME A TIME WHEN YOU ENTERED THE HEARING ROOM?
A YES.
Q AND DO YOU REMEMBER ABOUT WHEN THAT MIGHT HAVE BEEN?
A IT WAS AFTER TWO O'CLOCK.
Q OKAY. WHEN YOU ENTERED THE HEARING ROOM, WOULD YOU DESCRIBE WHAT YOU SAW? CT Page 6244
A WHEN I ENTERED THE ROOM, JUDGE PICKETT WAS AT HIS DESK, AND MR. KANE WAS SITTING BEHIND THE WITNESS TABLE OR —
Q AND AT THAT TIME WERE THE JUDGE AND DR. KANE ENGAGED IN CONVERSATION?
A YES.
Q DID YOU CONTINUE TO ENTER THE ROOM?
A YES.
Q WHAT THEN OCCURRED?
A SAT DOWN NEXT TO DR. KANE, AND BEGAN TO ORGANIZE FILES, AND THEY CONTINUED TO HAVE THEIR CONVERSATION.
Q OKAY. WOULD YOU PLEASE DESCRIBE THE CONVERSATION?
A DR. KANE ASKED JUDGE PICKETT HOW REESE WAS DOING AND IF HE STILL HAD A TR6, AND JUDGE PICKETT CORRECTED HIM AND SAID IT WAS A SPITFIRE AND THAT IT WAS NOT RUNNING BECAUSE IT DIDN'T HAVE A MOTOR, AND DR. KANE THEN WENT ON TO SAY REESE SHOULD GRAB THE CONDO, THAT IT WAS FOR SALE, AND WHERE SOMEBODY HAD A DELI BECAUSE IT WAS GOING FOR FIFTY-FIVE THOUSAND AND IT WAS A STEEL, AND THEY FURTHER DISCUSSED THAT SOMEONE HAD TRIED TO GET A PIZZA PLACE IN THERE, BUT THAT BROUGHT IN LESS THAN DESIRABLE CLIENTELE. THEN THEY WENT ON TO DISCUSS OWNING AND RENTING MITSUBISHIS, AS THEY HAD DURING THE TRIAL, AND THAT THEY WERE A LOUSY CAR, AND THEN THEY BRIEFLY MENTIONED A GOLFING EVENT BEFORE PEOPLE CAME — EVERYONE CAME BACK TO THE ROOM.
Q DO YOU RECALL WHEN YOU WERE ABLE TO TELL ME ABOUT THAT CONVERSATION?
A NO, I DON'T. IT WAS EITHER LATE THURSDAY AFTERNOON, AFTER WE WERE DONE FOR THE DAY OR LATE FRIDAY AFTERNOON.
MS. WEBSTER-O'KEEFE: NOTHING ELSE, YOUR HONOR, WITH THIS WITNESS.
THE COURT: CROSS-EXAMINE. CT Page 6245
CROSS-EXAMINATION BY MR. MOOTS:
Q WHO WAS IN THE ROOM?
A JUDGE PICKETT AND DR. KANE.
Q ANYBODY ELSE?
A NO.
Q AND YOU SAID THAT YOU MADE THIS KNOWN LATE THURSDAY OR FRIDAY AFTERNOON, BUT YOU DON'T REMEMBER WHEN?
A THAT IS CORRECT.
Q AND WE TOOK A BREAK THURSDAY AFTERNOON, DIDN'T WE?
A YES, WE DID.
Q MID-AFTERNOON?
A YES.
Q YOU DIDN'T TELL HER THEN?
A NO, I DID NOT.
Q DID YOU TELL HER AFTER THE CLOSE OF THE HEARING?
A I REALLY CANNOT REMEMBER WHICH DAY I TOLD HER.
Q THERE WASN'T SOMETHING THAT REALLY BOTHERED YOU ABOUT THIS CONVERSATION THAT YOU HEARD?
A IT NIGGLED AT ME.
Q AND BUT NOT ENOUGH TO BRING IT TO THE ATTENTION OF YOUR EMPLOYER EITHER THAT DAY OR UNTIL LATE THE FOLLOWING DAY?
A THAT IS CORRECT.
Q AND THIS WAS A CONVERSATION TAKING PLACE IN A NORMAL VOICE, OR WERE THEY WHISPERING? CT Page 6246
A A NORMAL, CHUMMY TONE.
Q OKAY. WHEN YOU WALKED IN THE HEARING ROOM THAT DAY, WAS THE DOOR OPEN?
A NO, IT WAS NOT.
MR. MOOTS: I HAVE NO FURTHER QUESTIONS.
MS. WEBSTER-O'KEEFE: NOTHING, YOUR HONOR.
THE COURT: YOU ARE SURE THE DOOR WASN'T OPEN?
THE WITNESS: I LIGHTLY TAPPED ON THE DOOR AND CAME IN.
THE COURT: AND YOUR TESTIMONY IS THAT THAT DOOR WAS SHUT WITH DR. KANE AND ME IN THERE ALONE?
THE WITNESS: YES, IT IS, SIR.
THE COURT: WELL, I AM SURE WE WILL HERE FROM DR. KANE. YOU MAY STEP DOWN.
ANY FURTHER EVIDENCE?
MS. WEBSTER-O'KEEFE: YES, YOUR HONOR. MRS. KANE, WILL YOU TAKE THE WITNESS STAND.
(WHEREUPON, THE WITNESS TESTIFIED, THE PLAINTIFF RESTED, AND THE FOLLOWING TOOK PLACE.)
ROBERT KANE,
 CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, HAVING BEEN DULY SWORN BY THE CLERK TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, TESTIFIED ON HIS OATH AS FOLLOWS:
THE CLERK: STATE YOUR NAME, SPELL YOUR LAST NAME, CT Page 6247 AND GIVE YOUR ADDRESS FOR THE RECORD.
THE WITNESS: ROBERT KANE, 291 WOOD FIRE ROAD, NEW PRESTON, CONNECTICUT.
THE CLERK: THANK YOU. YOU MAY BE SEATED.
DIRECT EXAMINATION BY MR. MOOTS:
Q DR. KANE, DO YOU RECALL LAST THURSDAY, JUNE THE 8TH?
A YES.
Q DO YOU RECALL BEING ON TRIAL WITH REGARD TO YOUR DISSOLUTION OF MARRIAGE CASE?
A YES, I DO.
Q I AM GOING TO ASK YOU, DO YOU RECALL TAKING A LUNCH BREAK AT OR ABOUT ONE O'CLOCK THAT DAY?
A YES.
Q AND WHERE DID YOU GO?
A I BELIEVE I WENT DOWN TO THE GREEN AND HAD A SANDWICH.
Q WHERE DID YOU GO AFTER THAT?
A CAME BACK INTO THE COURTHOUSE.
Q OKAY. ABOUT WHAT TIME?
A I DON'T KNOW.
Q WAS IT BEFORE TWO O'CLOCK?
A YES.
Q WHAT DID YOU DO WHEN YOU CAME BACK TO THE COURTHOUSE?
A I BELIEVE MY RECOLLECTION IS WE STOOD AROUND IN THE HALLWAY. I DON'T REMEMBER GOING DOWNSTAIRS WITH YOU BUT — CT Page 6248
Q DO YOU REMEMBER BEING IN THE HALLWAY?
A UH-HUH.
Q AND DO YOU RECALL GOING INTO THE — WHERE WERE WE TRYING THE CASE, BY THE WAY?
A JUDGE'S CHAMBERS.
Q THERE WERE OTHER TRIALS TAKING PLACE?
A YES.
Q DID YOU MOVE AT THAT POINT?
A YES.
Q WHAT DID YOU DO WHEN YOU CAME BACK UPSTAIRS?
A I GUESS I HAD HUNG AROUND IN THE HALLWAY FOR A WHILE AND WENT AND SAT DOWN.
Q ABOUT WHAT TIME DID YOU — HAVE YOU ANY IDEA WHAT TIME YOU WENT IN AND SAT DOWN?
A PROBABLY FIVE OF TWO, TEN OF TWO. FIVE OF TWO.
Q YOU WALKED IN THE JUDGE'S CHAMBERS. WHERE DID YOU SIT?
A I SAT AT THE FIRST TABLE ON THE RIGHT-HAND SIDE GOING IN.
Q COUNSEL TABLE?
A YES.
Q WHERE WE WERE SITTING?
A YES.
Q WAS ANYBODY ELSE IN CHAMBERS AT THE TIME?
A THE JUDGE WAS THERE, AND IF I AM NOT MISTAKEN, I THINK CHARLIE WAS THERE ALSO? CT Page 6249
Q CHARLIE MEANING?
A THE COURT STENOGRAPHER.
Q THE COURT REPORTER?
A I THINK SO.
Q WAS ANYBODY SAYING ANYTHING TO ANYBODY?
A NO.
Q AND DID YOU SAY ANYTHING TO THE JUDGE?
A YES.
Q WHAT DID YOU SAY TO THE JUDGE?
A I JUST ASKED HIM HOW REESE OWENS WAS DOING.
Q AND HE REPLIED?
A YES, HE DID.
Q WHAT ELSE DID YOU ASK HIM?
A I ASKED HIM HOW REESE'S CAR WAS RUNNING BECAUSE HE HAD A BUG-EYE SPITFIRE, AND I HAVE A TR6, AND —
Q DID HE ANSWER YOU?
A HE SAID IT WASN'T RUNNING TOO WELL.
Q WAS ANYTHING ELSE SAID?
A WE TALKED ABOUT THE STONE MILL CONDOMINIUM, AND I ASKED HIM THAT I HEARD THAT REESE WAS GOING TO PUT HIS BUSINESS ABOVE THE FIREHOUSE IN THE DEPOT, AND I RELAYED THAT THERE WAS A CONDOMINIUM FOR SALE ON 202.
Q AND WAS ANYTHING ELSE DISCUSSED?
A NO. CT Page 6250
Q DID REESE OWENS HAVE ANYTHING TO DO WITH THIS CASE?
A NO.
Q ARE YOU A PERSONAL FRIEND OF HIS, BY THE WAY?
A NO.
Q HOW DO YOU KNOW HIM?
A A PATIENT OF NINE, AND IN A TOWN OF THREE THOUSAND, YOU KIND OF KNOW EVERYBODY.
Q DO YOU SOCIALIZE WITH HIM?
A NO.
Q HOW LONG DID THIS CONVERSATION BETWEEN YOU AND JUDGE PICKETT TAKE PLACE?
A HOW LONG DID IT LAST?
Q YES.
A THIRTY SECONDS TO A MINUTE.
Q OKAY. WAS ANYTHING ABOUT THE CASE DISCUSSED?
A NO, NOTHING AT ALL.
Q WAS ANY ISSUE AT ALL DISCUSSED ABOUT THE TRIAL OR IN THE CASE IN ANY WAY, SHAPE, OR FORM DISCUSSED WITH JUDGE PICKETT?
A NO, IT WAS NOT.
Q WAS THIS DONE IN HUSHED TONES OR NORMAL VOICE?
A NORMAL VOICE.
Q WHY DID YOU EVEN SAY ANYTHING TO JUDGE PICKETT?
A KIND OF — I DON'T KNOW. JUST IT WAS AWKWARD JUST BEING CT Page 6251 IN THERE ALL QUIET AND WHATEVER AND STARTED CONVERSATION.
Q DO YOU RECALL MS. WEBSTER-O'KEEFE'S PARALEGAL WALKING INTO THE JUDGE'S CHAMBERS?
A NOT REALLY.
Q DID YOU HAVE DIFFICULTY EVEN REMEMBERING THE CONVERSATION WHEN I SENT YOU THIS MOTION FOR MISTRIAL?
A NO DOUBT ABOUT IT.
Q DID YOU TRY TO HIDE TO CONVERSATION IN ANY WAY —
A NO.
Q — FROM ANYBODY NIGHT HAVE BEEN IN THERE AT THE TIME?
A NO. NO.
Q WAS THE DOOR — WHEN YOU WERE HAVING THIS CONVERSATION WITH THE JUDGE, WAS THE DOOR OPEN OR SHUT?
A IT WAS OPEN.
MR. MOOTS: I HAVE NO FURTHER QUESTIONS.
CROSS-EXAMINATION BY MS. WEBSTER-O'KEEFE:
Q DR. KANE, DURING THIS CONVERSATION, NO COUNSEL WERE PRESENT, WERE THERE?
A NO.
Q AND MRS. KANE WASN'T PRESENT EITHER, WAS SHE?
A NO, SHE WAS NOT.
Q YOU INDICATED THAT CONVERSATION — THIS ENTIRE CONVERSATION TOOK PLACE IN THIRTY SECONDS TO A MINUTE?
A MY BEST RECOLLECTION, YES. CT Page 6252
Q THE CONDOMINIUM THAT WAS DISCUSSED IN THAT CONVERSATION, THAT CONDOMINIUM BUILDING WAS DISCUSSED DURING THE TRIAL, WASN'T IT?
A YES.
Q AND THE MITSUBISHI THAT WAS DISCUSSED DURING THAT CONVERSATION WAS ALSO DISCUSSED DURING THE TRIAL, WASN'T IT?
A WELL, I LEASED THE MITSUBISHI, YES.
Q BUT THAT WAS DISCUSSED DURING THE TRIAL ALSO; ISN'T THAT CORRECT?
A I BELIEVE SO, YES.
MS. WEBSTER-O'KEEFE: I HAVE NOTHING ELSE, YOUR HONOR, OF THIS WITNESS.
MR. MOOTS: NOTHING FURTHER, YOUR HONOR.
THE COURT: YOU MAY STEP DOWN.
 MS. WEBSTER-O'KEEFE: YOUR HONOR, IF I MAY TAKE ONE MOMENT.
THE COURT: MR. MOOTS, DO YOU HAVE FURTHER EVIDENCE?
MS. WEBSTER-O'KEEFE: IF I MAY HAVE ONE MORE MOMENT, YOUR HONOR, I WOULD LIKE TO RECALL MS. VAN KEUREN TO THE WITNESS STAND FOR A QUESTION.
DEBRA VANKEUREN,
 CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING BEEN PREVIOUSLY DULY SWORN BY THE CLERK TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, CONTINUED AND TESTIFIED ON HER OATH AS FOLLOWS:
THE CLERK: YOU HAVE ALREADY BEEN SWORN AND ARE STILL UNDER OATH. CT Page 6253
THE WITNESS: THANK YOU.
REDIRECT EXAMINATION BY MS. WEBSTER-O'KEEFE:
Q MS. VAN KEUREN, DO YOU RECALL HOW LONG YOU WERE IN CHAMBERS WHILE THIS CONVERSATION WAS TAKING PLACE?
A I WOULD SAY FIVE TO TEN MINUTES.
Q THAT IS HOW LONG THE CONVERSATION TOOK PLACE?
A YES.
Q THANK YOU.
MS. WEBSTER-O'KEEFE: NO OTHER QUESTIONS.
THE COURT: MR. MOOTS.
RECROSS-EXAMINATION BY MR. MOOTS:
Q WHAT TIME DID YOU GET INTO THE JUDGE'S CHAMBERS?
A I WOULD — AROUND TWO O'CLOCK.
Q DO YOU RECALL WHAT TIME WE STARTED PROCEEDINGS THAT DAY?
A NO. I BELIEVE WHAT TIME WE WERE SUPPOSED TO — AND ACTUALLY, I RECALL WE WERE SUPPOSED TO BE BACK AT FIVE TO, AND THERE WERE CONVERSATIONS TAKING PLACE IN THE HALLWAY WITH ATTORNEYS AND THEIR CLIENTS. SO I AM SURE IT WAS AFTER TWO SO —
Q IT IS YOUR TESTIMONY THAT THE CONVERSATION THAT TOOK
PLACE BETWEEN DR. KANE AND JUDGE PICKETT WAS FIVE TO TEN MINUTES IN LENGTH?
A YES, I DO RECALL THAT BEING —
Q AND THAT THERE WAS NOBODY ELSE IN CHAMBERS?
A THAT IS HOW I RECALL IT. CT Page 6254
MR. MOOTS: NOTHING ELSE, YOUR HONOR.
 (WHEREUPON, COLLOQUY DISCUSSION OCCURRED, AND THE FOLLOWING TOOK PLACE.)
 THE COURT: WELL, FIRST OF ALL, THE MOST IMPORTANT EVIDENCE THAT IS BEFORE THE COURT IS THE FACT THAT YOUR PARALEGAL ALMOST VERBATIM RELATED THE TESTIMONY OF DR. KANE. NOW, FOR THAT TO HAPPEN, SHE HAD TO BE IN THE ROOM DURING THE ENTIRE TIME THE CONVERSATION TOOK PLACE. SHE DIDN'T COME IN IN THE MIDDLE OF THE CONVERSATION IF SHE KNOWS WHAT THE ENTIRE CONVERSATION WAS, AND SO THERE WAS NO EX PARTE, AS I INTERPRET IT, AND SHE WAS THERE AT ALL TIMES.
 LIKEWISE, NOW, NOT ONLY AS A JUDGE OF THE SUPERIOR COURT, BUT AS AN OFFICER OF THE I KNOW THAT THE DOOR WAS OPEN BECAUSE, OTHERWISE, DR. KANE WOULDN'T HAVE BEEN THERE AND NEITHER WOULD THE PARALEGAL BECAUSE NOBODY COMES IN UNLESS THEY KNOCK AND I SAY "COME IN," AND IF THERE ARE PEOPLE OUT THERE ON THE CASE, I WOULD WAIT AND SAY, "IS EVERYBODY READY, COME ON IN," AND BECAUSE WE ARE USING, AS EVERYBODY KNOWS, AND ESPECIALLY TODAY THIS COURTHOUSE IS OVERCROWDED MOST OF THE TIME, AND THE TRIAL IS TAKING PLACE IN CHAMBERS, I LEFT THE DOOR OPEN SO WHEN PEOPLE CAME BACK FROM LUNCH, THEY HAD THEIR PAPERS LEFT ON THE TABLE AND THEY COULD ARRANGE THEM AND LOOK AT THEM.
 LIKEWISE, AS TO THE CONVERSATION WITH DR. KANE, I BELIEVE IT WOULD HAVE BEEN IMPOLITE IF I SAID TO HIM, GET OUT AND I CAN'T TALK TO YOU OR ANYTHING OF THAT NATURE. IT HAD NOTHING TO DO WITH THE CASE, AND I DIDN'T KNOW THAT HE KNEW MY STEPSON, AND UNTIL THIS MORNING I DIDN'T KNOW WHAT THE RELATIONSHIP WAS WITH HIM, AND THERE HAS NEVER BEEN A CONNECTION IN MY EYES, AND I DON'T BELIEVE THERE IS ANY MERIT TO THE PARTICULAR SITUATION, AND IT IS NOT A SITUATION COMMENTING UPON ANY WITNESS IN THE CASE. THE DOOR WAS NOT SHUT, AND IT WAS NOTHING TO DO WITH THE ISSUE OR INDICATING ANY PREFERENCE TOWARDS ANY WITNESS.
 FOR THE REASONS STATED, THE MOTION IS DENIED. AS FAR AS THE MOTION FOR EXTENSION OF TIME TO FILE A BRIEF, CT Page 6255 I WILL GRANT YOU UNTIL THIS FRIDAY THE 16TH AT FOUR P.M.
* * *
No. FA-93-0063450 : SUPERIOR COURT ROBERT E. KANE : JUDICIAL DISTRICT vs. : OF LITCHFIELD ELIZABETH G. KANE : JUNE 13, 1995
-CERTIFICATE-
I, KIMBERLY R. BECK, HEREBY CERTIFY THAT THE WITHIN AND FOREGOING CONTAIN AN ACCURATE AND COMPLETE TRANSCRIPTION OF N.Y.S.TENOGRAPHIC NOTES, AS REQUESTED, TAKEN ON JUNE 13, 1995, TO THE BEST OF MY ABILITY.
DATED AT LITCHFIELD, CONNECTICUT, ON THIS 29TH DAY OF JUNE, 1995.
 KIMBERLY R. BECK CERTIFIED COURT REPORTER